The next matter, number 25-1914, AbbVie Inc. et al. v. Aaron M. Frey et al. At this time, would counsel for the appellants please introduce themselves on the record to begin? Good morning, Your Honors. May it please the Court, Matthew Owen on behalf of AbbVie. I know that the Court has a number of related arguments this morning, so unless the Court has a different direction, I'm going to try not to duplicate too much of what Counsel for Novartis has said. But I would like to pick up on a few themes that the Court has explored already so far. And if I could reserve two minutes for rebuttal as well, I'd appreciate it. The first is discussing field preemption and related issues. I think the best way of understanding what field Maine is trying to occupy is simply to ask what Maine's law applies to and what it does not. The only thing that Maine's statute applies to is the 340B program. You know that for a couple of reasons. One is that basically every term in the Maine law refers on its face to the 340B program. If Congress repealed the 340B program tomorrow, this Maine law would have no effect at all. And if you, just to emphasize the point, in respect to the 340B program, I mean, I agree with you, it applies to those 340B participants, but isn't the second step and what Congress wanted to do is to keep everybody out of that? Well, I think, Your Honor, there's a couple of different responses to that that are a little unrelated, but I'll try to give you both of them. The first is to go back to the Maine Forrester Cormier case that this Court issued. I think I'd like to maybe frame it just a little differently. The Court in that case addressed this issue, which is, you know, how do you know what the real obstacles that are in a conflict preemption case, when do they really collide, how far does the congressional right go? This was the issue. And I think it started on page 8 of the Court's opinion in that case. They said, you know, there's really been a shift in the way we talk about these cases. The better thing to do is to focus on what rights explicitly or implicitly the Congress has provided. And here I think actually the right is very simple. It's the right to participate in Medicare Part B and Medicaid. That is, we have a right to participate in other federal programs, Medicare Part B and Medicaid, if we comply with this rule that we must offer our drugs at 340B prices on commercially reasonable, bona fide terms. If we do that, we have a right. The last piece of what you said is not in there. You are adding that on to offer and says that what Congress said is offer subject to commercially reasonable terms, thereby preventing any other party from limiting what those terms are. I mean, that may be right, but you are adding that to the text. I think that is an – I think that that's – it's not that I'm adding it to the text, Your Honor. I think that's the best interpretation of what the offer – the shall offer provision of federal law means, which is what Section 4 of the D.C. Circuit's opinion in the Novartis case kind of says, is that you can put it – you can put your own conditions on them, but they have to add up to a bona fide offer. There is a federal standard to be applied there. But even if that weren't true, Your Honor, I want to sort of take the court to a slightly different place related to our claims. I think, Judge Afrain, that you are entirely right. I think counsel for the state has conceded it, that what the purpose of this law, the main statute, is to increase the volume of sales at the 340B price that my client is required to engage in. Now, whether – if it's true that Congress, even if I accepted the premise, which I don't, that Congress has left that entirely to the states, they have neither required nor forbidden us to impose particular conditions of this kind. If a state acting totally on its own, as part of its police power, passes a law that says you must surrender your physical chattels to another person in unlimited amounts at a confiscatory price, and Congress didn't require you to do that, that is a straightforward taking of physical property. I was thinking, Judge Thompson, of your opinion in the Roberto Clemente case that distinguishes intangible regulatory takings from this very thing, where what the statute says is you must sell your stuff to someone else, whether you want to or not, in greater volumes than you would otherwise be required to. In Horn v. Department of Agriculture, the Supreme Court, that's the raisins case, they said, yeah, look, if Congress or a government says you have to sell, you have to convey your property, you lose title to it, and you lose the right to control the disposition of that property, that is a straightforward physical taking. And it doesn't matter whether it's economically the same as a… …agreed to a program that is only, what the manufacturer understood is they agreed to a program that had a price ceiling and an obligation to offer subject to certain, I'll call them fraud-related exceptions, and that's the program you agreed to, and then there are regulations, once you've agreed to that program, that you have to follow, then you have agreed to enter that program, subject to understanding that not every detail of the program has been worked out. Well, I think, Your Honor, if the states said that, I think they would be conceding that the thing we agreed to is the 340B program. We didn't agree to the main statute. And that is the D.C. Circuit's opinion in Valencourt books, which we cite. Judge Srinivasan explains this pretty well, I think. There were two provisions of the Copyright Act at play there. One of them said you had to surrender certain rights in exchange for X benefit, and then Congress said also you have to give up Y, some further thing. Here, if we didn't comply with these additional means, and to be clear, the D.C. Circuit said that second statute is a taking and voluntary participation in the first part of the Copyright Act didn't count. That was not enough to justify the new provision because there was no additional incremental benefit that the government conveyed in exchange for that new obligation to surrender their property. This is the same because the 340B statute, I think everyone agrees that under Sanofi and Novartis, we have a right to participate in Medicare and Medicaid while implementing the policies at issue in this case. That is, we can have a one-contract pharmacy limitation. We can require the provision of claims data. Maine is saying if you want to continue to participate in Medicare and Medicaid and provide Medicare and Medicaid patients with drugs and participate in 340B, in exchange for nothing else that you didn't already have, you also have to sell in unlimited amounts your drugs to people we like better than you and that we can tell you to sell to that you refuse otherwise to sell to in exchange for nothing. That is not within the voluntary participation doctrine. That's just a taking. Before I sit down, Your Honor, I'd like to go back to the ADR point that came up very briefly in the Novartis argument. I'd like to take at least one chance at convincing you that actually ASTRA needs to be read not just to be about price as such, but to be about the word overcharge in the 340B statute, which has been subsequently clarified by an extant federal regulation that has the force of law. So to be clear, at the time ASTRA was decided, this regulation did not exist. What ASTRA says on page 122 of the Court's opinion in that case is it cites the 340B statutes, 256B, 42 U.S.C., 256B, Section D, 1 and 3, which is where Congress said we're going to set up an ADR tribunal at the agency and we're going to give it exclusive jurisdiction over claims that someone has been, quote, overcharged. That's what ASTRA said made it impermissible to have lawsuits in court about price. After that, the agency defined the word overcharge in its regulation to mean a claim that a manufacturer has imposed any limitation on access to 340B pricing. That's 42 CFR 10.21A. It straightforwardly covers everything about this main law. It just didn't exist at the time of ASTRA. But if you go and read the entirety of the ASTRA case, you would see repeatedly that what the Supreme Court said is Congress intended there to be one unified, federal, harmonious, comprehensive regulation. As I understand it, what the ADR program does is it applies 340B's terms, case law about 340B, and again, it seems like this all comes down to do you think that volume regulation is within 340B and then if you do, it's a limitation on, I guess, a price, but if you think it's just not part of the program. So, I mean, it just seems like everything comes back to what do you think the D.C. and Third Circuit mean there. Well, I could have two very brief responses to that. The first is, to be clear, the argument about ADR preemption, what I'm saying now, doesn't really depend on who should win that case. I mean, if someone brings this claim in front of the ADR panel, someone could appeal to the D.C. Circuit and they could say whether they think who's right or wrong about that. This is a claims channeling, more of a jurisdictional issue. The fact that somebody may or may not win about what 340B requires doesn't mean that we can have lawsuits in state courts about the very thing the Supreme Court said you can't have any lawsuits about at all in any court. That's the first item. And then to go back to the very beginning of your question, whether or not the 340B statute itself says that we have a right to participate under the conditions that we have these limitations on our offers. I do think that Counsel for Novartis was right about this when she talked about the spending clause, but I would make it more concrete. We have a contract. The contract, that's what the 340B statute says we have to do. Enter into a contract. It's a real piece of paper called a PPA between AbbVie and the United States, and it says if you do A, B, and C, you get these benefits. And what Maine has come along and say is if you do A, B, and C, you cannot just get those benefits. You also have to do D, E, and F, the three things in the Maine statute. And that, I'm not aware of any case in Boyle versus United States suggested otherwise that allows a state to regulate directly a contract between a private person and the United States government that Congress has specified itself what the terms of that contract would be. And in the end, that's what this boils down to. We have that federal relationship as in Buckman and sort of Decroce is a similar kind of case, and the state is trying to interfere with it. And they cannot do that. Thank you very much. Thank you, Counsel. At this time, would Counsel for the Government please introduce herself on the record to begin? Good afternoon. Kimberly Capordon on behalf of the state and the defendant. AbbVie's appeal is different from DiBarto's, which we just talked about, in two ways. The first is the takings claim, and I think the second is whether AbbVie preserves sort of the targeting argument in support of preemption. On the takings claim, you can stand on our brief unless the court has questions. Well, I mean, I don't really advise that. They made a pretty powerful argument that this target requires them to do something, which is sell their product when they otherwise would not have, and that that's taking their product because under 340B, I think it is clear they don't have to sell it to these pharmacies. So without your law, they wouldn't have to do it. And because of your law, they have to do it. And they say that's a taking. Why is it not a taking? Because Chapter 103 doesn't compel a sale of AbbVie's products. At a broad level, I think we're really relying on AbbVie's voluntary participation in the 340B statute. That's what requires the sale. The state agrees with the Fifth Circuit's analysis of this issue in Fitch. Chapter 103 does not impose a positive obligation to transfer or sell drugs to anyone. It also doesn't require them to sell more of their drugs at discounted prices than Section 340B itself requires. AbbVie will receive the full discount price for those drugs. Chapter 103 instead imposes a negative obligation. That's what the Fifth Circuit said in Fitch. A negative obligation of noninterference with covered entities' arrangements with contract pharmacies. That doesn't constitute a physical taking. We think the district court got this right and that their voluntary participation in the 340B program forecloses the taking. But they would have otherwise received more by way of compensation for the drugs that have been transferred to the pharmacies. So perhaps the drugs may have been sold, but they would have received a different price for them. And now you're saying, no, manufacturers, you won't get paid for the drugs at the same price that you otherwise would charge. So that seems to me to be, okay, now we're not going to allow you to be compensated how you otherwise would be. So, again, I think we talked about this earlier, talking about whether or not Chapter 103 is affecting the price of the transaction in between a manufacturer and the covered entity. And, again, we disagree that that price is controlled in any way by Chapter 103. Because if a covered entity does not agree to the conditions that have been imposed, that transaction simply does not occur. There might be a different substitute transaction that takes place. But simply because a different transaction happens between different parties doesn't mean that Chapter 103 is affecting the price that manufacturers like AbbVie must charge or must charge or the discounted price for the 340B program. With respect to claims data, Chapter 103 does make it perhaps a little bit more difficult to obtain claims data. But I think it's important to note here what AbbVie is not arguing. They are not saying that they have ever been unable to access the audit provisions of the 340B program or that they were unable to access it because of the lack of claims data. The standard for triggering a manufacturer-initiated audit under the 340B program is low at reasonable odds. I mean, there's some factual aspect to this. Is this a problem? Is this not? Is that? Was there evidence about that? There was no evidence that was provided to the district court that suggested that AbbVie had not been able to access the audit process due to the lack of claims data. I don't recall that in the record. What is the state policy targeting by that prohibition? What is the state policy targeting by? Yeah, the prohibition about accessing the claim data. What is the state law trying to achieve with that? So, I think that the claims data is another condition that manufacturers have imposed. This was an issue in Santa Fe and also in Johnson. But it can be, I think, an onerous requirement. I will say that the provision only on the covered entities on providing the claims-level data. And there's also to the extent that this is the type of data that would be provided through an audit under the federal regulations. But it's onerous and thus what? So, I think it can be onerous on the covered entities to provide this type of data. And so, the state didn't want to condition the statute acts to prevent conditioning delivery of more 340B drugs on the claims data. It's not to say that the claims data is unavailable or can't be a part of the agreement generally. It's just that the manufacturer can't condition delivery. What other mechanism do the manufacturers have to obtain that information? Well, it certainly can be acquired through the audit process. That's exactly the type of information that would be provided in an audit under the federal regulations. There's a threshold to get to an audit, right? So, you have to have some reason to engage in the audit. So, it seems to me that you have to get there. And what I'm not quite sure I understand is how you get there without any information. I think the Federal Register or HRSA has answered this question. The standard is that a reasonable person could believe an entity may have violated a statute. That standard is not really exceedingly burdensome. And HRSA has said that significant changes in quantities of specific drugs ordered by a covered entity or complaints from patients or other manufacturers about activities of a covered entity can suffice to meet that burden. Claims data is really just unnecessary to necessarily meet this reasonable cost standard. This would be a conflict preemption argument. Is your position, I mean, you seem to acknowledge it at least makes it more difficult, but is that just not enough to be a conflict? Is that the premise? Yes, under Walsh. That's right. I think ultimately the alleged obstacle from Chapter 103 regarding claims data is unsupported by any evidence provided by AbbVie, who was the party that had the burden of proof on this issue. Thank you. Thank you, Counsel. At this time, would Counsel for the appellant please reintroduce himself? He has a two-minute rebuttal. Thank you, Your Honor. Matthew Owen again for AbbVie. May it please the Court, just a few points on rebuttal. The first is on the issue of takings and compelled sales, I want to point to at least two things. The first is the actual text of the main statute, which we haven't discussed perhaps enough today. What it says is that a manufacturer may not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug or delivery of a 340B drug. Now, the word acquisition is in the statute. I have yet to hear the state explain what it is doing there if it is not a prohibition on us refusing to let someone acquire our property in the first place. Now, what Counsel just said is that if we won't sell the drugs, in other words, if the covered entity doesn't agree to our terms and there is no transaction, to be really clear, if that's true, then there is no dispute in any of these cases because if manufacturers are allowed to continue with their one-contract pharmacy policy, claims data demands on the condition that if you don't agree to that, we won't sell, then if our policies are legal, then I'm not sure that there is anything to do here other than to dismiss these cases for lack of standing and let our clients go about their business. The second thing is if you look at the red brief in our case on page 46 and in the introduction, it's very clear that the government of Maine thinks that this law is going to generate an enormous amount of revenue, which is money. Money comes from forcing someone to sell more of our property at a penny so that it can be resold at full price to patients and their insurers and the difference split between hospitals and CVS. You can't regulate how people sell things, the prices they sell things, who they sell them to. If that's a taking at all, it's a regulatory taking. Well, no, Your Honor, I think that you can, of course, regulate when someone can't sell something. You can regulate how it can be sold. You could certainly require medicine to be transported in particular ways, but a statute that says you own this chattel, you must give it to that other private person for a penny, you don't get paid for it, and it doesn't matter whether there's any economic integration plan constituting a public use, which they don't even argue there is. That's a taking. You might have to pay for it. The state might have to design a public use plan, but they can't just require us to deliver our property. If I could have 10 seconds to point to something on claims data, I think counsel suggested there was no evidence in the record at all that we need claims data or can't do audits. I would point to two things. The first is the Scheidler Declaration is in the record. It's at JA88 that explains that we can't really get claims data usually because covered entities don't want to give it to you. And the second is all of the discussion of the replenishment model in the record. Just to be very clear, what we're talking about is because drugs have already been sold at full price to poor people and their insurers and ingested, and then retroactively what is done is the covered entities have to figure out which of those people were patients of the covered entities. And the way they do that is with claims data. So there really isn't any other way for us, for anyone, to know whether someone's been diverting drugs to people who aren't patients except with the claims data. That's how they do it, and therefore we can't do it without that data either, which is what Judge Wyrick in Oklahoma said, too. Thank you. Thank you, counsel. That concludes argument in this case.